**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 10-cv-02578-CMA-CBS

BETH EBURN,

    Plaintiff,

v.

CAPITOL PEAK OUTFITTERS, INC.,

    Defendant.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND GRANTING DEFENDANT'S
CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

This matter is before the Court on Plaintiff's Motion and Memorandum Brief for Summary Judgment Re: Defense of Exculpatory Agreement (Doc. # 22) and Defendant's Response to Plaintiff's Motion for Summary Judgment and Memorandum Brief in Support of Defendant's Cross Motion for Summary Judgment (Doc. # 26).[1] The narrow issue presented is whether Defendant, Capitol Peak Outfitters, Inc. ("CPO"), is precluded from liability for the allegedly negligent acts or omissions attributed to it by Plaintiff, Beth Eburn ("Eburn"), because of an exculpatory agreement she signed.[2]

---

[1] The Court notes that Defendant improperly combined its response to Plaintiff's motion with its own cross motion. *See* D.C.COLO.LCivR 7.1C. ("A motion shall not be included in a response or reply to the original motion. A motion shall be made in a separate paper."). Nonetheless, and despite Plaintiff's failure to file a response, the Court will accept Defendant's cross motion as filed, because it does not raise any new issues on which the Court bases its ruling.

[2] Because both parties seek summary judgment only on the exculpatory agreement issue without addressing Eburn's other claims for relief, their motions are actually for **partial** summary judgment and, therefore, the Court will refer to them as such.

Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).  For the reasons that follow, the Court determines that the exculpatory agreement protects CPO from liability for any alleged negligence and, therefore, (1) denies Eburn's motion for partial summary judgment and (2) grants CPO's cross motion for partial summary judgment on its affirmative defense of waiver and release.

## I. BACKGROUND

In August, 2010, Eburn participated in a horseback ride arranged by CPO, which is an "equine activity sponsor" under Colorado law.[3]  (Doc. # 41 at 5-6.)  Before the ride, Eburn signed at least two forms: one is entitled "Participant Release of Liability and Assumption of Risk Agreement," and the other, "Protective Headgear Refusal" (collectively, "the exculpatory agreement").  (Doc. # 26-1.)  Toward the top of the exculpatory agreement are the typewritten words "Organization Name," followed by "Capitol Peak Outfitters inc [*sic*]," in longhand.  Below that is typewritten "Participant Name," followed by several handwritten names,[4] including that of "Beth Eburn."  (*Id.*)

The body of the exculpatory agreement provides on the first page, in pertinent part:

---

[3] "'Equine activity sponsor' means an individual, group, club, partnership, or corporation, whether or not the sponsor is operating for profit or nonprofit, which sponsors, organizes, or provides the facilities for, an equine activity . . . ."  Colo. Rev. Stat. § 13-21-119(2)(d).

[4] The other names are those of family members who joined Eburn for the ride.

> In consideration of being allowed to participate in any way in the program, related events and activities, the undersigned acknowledge, appreciate, and agree that:
>
> 1. The risk of injury from the activities involved in this program is significant, including the potential for permanent paralysis and death.
>
> 2. I KNOWINGLY AND FREELY ASSUME ALL SUCH RISKS, both known and unknown, EVEN IF ARISING FROM THE NEGLIGENCE OF THE RELEASEES or others, and assume full responsibility for my participation.
>
> [. . .]
>
> 4. I . . . HEREBY RELEASE, INDEMNIFY, AND HOLD HARMLESS THE _____, its officers, officials, agents and/or employees, other participants, sponsors, advertisers, and, if applicable, owners and lessors of premises used to conduct the event (RELEASEES), from any and all claims, demands, losses, and liability arising out of or related to any INJURY, DISABILITY OR DEATH I may suffer, or loss or damage to person or property, WHETHER ARISING FROM THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law.
>
> I HAVE READ THIS RELEASE OF LIABILITY AND ASSUMPTION OF RISK AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND SIGN IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT.

(*Id.* (emphasis in original).) Eburn's signature follows the above-quoted language. (*Id.*)

The second page further states, in relevant part:

> NOTICE OF INHERENT RISKS: Equines have the propensity to behave in ways that may result in injury, harm or death to persons on or around the equine; have unpredictable reactions to such things as sounds, sudden movement and unfamiliar objects, persons or other animals; are susceptible to certain hazards such as surface or subsurface conditions; collisions with other equines or objects. Propensities include kicking, biting, stamping, stumbling, rearing, and others. Tack equipment can fail, resulting in falling or loss of control. Participants could act in a negligent

> manner that may contribute to injury to the participant or others, such as failing to maintain control over the equine or not acting within the participant's ability.  Equine activities are INHERENTLY DANGEROUS.
>
> [. . .]
>
> We realize that we are subject to injury from this activity and that no form of preplanning can remove all of the danger to which we are exposing ourselves.
>
> [. . .]
>
> I . . . the undersigned, have read the foregoing statement carefully before signing and do understand its warnings and assumption of risks.

(*Id.* (emphasis in original).)  Again, Eburn's signature follows this language.  (*Id.*)  She admits to having signed the agreement.  (Doc. # 26-2 at 3.)

During the ride, Eburn fell from her horse and sustained injuries when her saddle rotated to the side of the horse as it accelerated.  (Doc. # 41 at 2-4.)  Thereafter, she filed a Complaint in this Court, alleging three claims for relief, though only her first claim, for negligence, is at issue here.[5]  (*See* Doc. # 1.)  She asserts that CPO caused her damages in failing to: (1) "make reasonable and prudent efforts to determine [her] ability to safely engage in the scheduled mountain trail horseback ride"; (2) "provide a horse suitable for [her] to safely manage based upon her ability"; (3) "properly secure the equipment used on [her] horse"; and (4) "have in place an emergency medical response plan for emergency medical care to an injured person."  (Docs. ## 1 at 7; 41 at 2.)  The

---

[5] When valid, exculpatory agreements only shield against claims of simple negligence.  *See, e.g.*, *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004).

only issue currently before the Court is whether the exculpatory agreement precludes CPO's liability for these allegedly negligent failures.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (quoting Fed. R. Civ. P. 1). For purpose of the motions currently pending, no facts are in dispute, and the parties agree that the Court's determination of whether the exculpatory agreement is valid and enforceable presents a purely legal question. *See, e.g.*, *Hamill v. Cheley Colorado Camps, Inc.*, 262 P.3d 945, 948 (Colo. App. 2011) (noting that determining the validity of an exculpatory agreement raises a "question of law").

## III. DISCUSSION

Before the Court can address the validity of CPO's assertion that the exculpatory agreement precludes Eburn's negligence claim, the Court must address whether CPO sufficiently apprised Eburn of the affirmative defense it asserts here.

### A. WHETHER CPO ADEQUATELY RAISED ITS AFFIRMATIVE DEFENSE

Eburn argues, CPO does not deny, and the Court agrees that CPO "failed to assert in its Answer any affirmative defense based on execution of any exculpatory

5

agreement by Ms. Eburn." (Doc. # 22 at 1.) Nonetheless, the Court determines that, for at least the following two reasons, consideration of the exculpatory agreement on the merits is appropriate here. First, as Eburn concedes, the February 10, 2011 scheduling order states that "Defendant maintains Plaintiff waived all rights to any litigation by signing an appropriately authored release." (Doc. # 11 at 3.) Thus, Eburn has been on notice for well over one year as to CPO's argument. Second, the March 9, 2012 Final Pretrial Order, in which the pleadings were deemed merged, includes the following description of CPO's defense:

> Plaintiff's claims are barred by the doctrines of waiver and release. Prior to going on the horseback trail ride, the [P]laintiff signed [CPO's] 'Participant Release of Liability and Assumption of Risk Agreement.' In accordance with this release, the Plaintiff knowingly and voluntarily agreed to release, indemnify and hold harmless Capitol Peak Outfitters, Inc. and its employees from any and all claims, demands and liability for any and all injuries suffered by her while participating in the horseback riding event.

(Doc. # 41 at 5, 16.) Eburn did not subsequently file a motion or otherwise indicate that CPO had not sufficiently raised this issue. As such, the Court concludes that Eburn has been on notice for many months as to CPO's defense of waiver and release and that, therefore, it can reasonably be considered here.

**B.    WHETHER THE EXCULPATORY AGREEMENT PRECLUDES EBURN'S NEGLIGENCE CLAIM**

As Colorado courts often state, "exculpatory agreements have long been disfavored." *B & B Livery, Inc., v. Riehl*, 960 P.2d 134, 136 (Colo. 1998). Such agreements "stand at the crossroads of two competing principles: freedom of contract

and responsibility for damages caused by one's own negligent acts." *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo. 1989). However, they are not *per se* void, so long as "one party is not 'at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.'" *Id.* (internal quotation marks and citation omitted). In determining the sufficiency and validity of an exculpatory agreement under Colorado law, the Court normally considers: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). However, Eburn contends, and the Court agrees, that only the fourth factor is at issue here. (*See* Doc. # 22 at 4.)

Contractual terms are ambiguous when "they are susceptible to more than one reasonable interpretation." *Riehl*, 960 P.2d at 136. Mere disagreement between the parties "over the meaning does not in and of itself create an ambiguity in the contract." *Hamill*, 262 P.3d at 950. Ultimately, if unambiguous, "a contract will be enforced according to the express provision of the agreement." *Riehl*, 960 P.2d at 136. In determining whether the intent of the parties has been clearly and unambiguously expressed, the Colorado Supreme Court looks to:

> 1) whether the agreement is written in simple and clear terms that are free from legal jargon; 2) whether the agreement is inordinately long or complicated; 3) whether the release specifically addresses the risk that caused the plaintiff's injury; 4) whether the contract contains any emphasis to highlight the importance of the information it contains; and 5) whether

> the plaintiff was experienced in the activity making risk of that particular injury reasonably foreseeable.

*Salazar v. On the Trail Rentals, Inc.*, No. 11-cv-00320, 2012 WL 934240, at *4 (D. Colo. Mar. 20, 2012) (unpublished).

In the instant case, the Court finds that the language of the exculpatory agreement clearly and unambiguously expresses the parties' intent to preclude CPO's liability for negligent acts. To begin with, as is evident from the language quoted above, the agreement is written in relatively simple and clear, non-legal terms. Also, the agreement comprises less than two full pages and is otherwise not very complicated. Additionally, it specifically addresses the reality that "[t]ack equipment can fail, resulting in falling or loss of control" and explicitly states that the signor assumes all risks from the activities involved, "including the potential for permanent paralysis and death . . . even if arising from the negligence of [CPO] . . . ." (Doc. # 26-1 (emphasis deleted).) With her signature, Eburn also agreed that "no form of preplanning can remove all of the danger to which [she was] exposing [herself]." (*Id.*) Further, the agreement emphasizes important information in several places through the use of capitalization. *See Brooks v. Timberline Tours, Inc.*, 941 F. Supp. 959, 962 (D. Colo. 1996) (noting that the use of capital letters in exculpatory agreement highlighted "the importance of the information contained in it").

The only factor that weighs in Eburn's favor is that she was an inexperienced horseback rider and was, therefore, at least theoretically less knowledgeable about

the potential injuries she could suffer. However, this factor alone is not dispositive. *See, e.g.*, *Riehl*, 960 P.2d at 138-140 (upholding an exculpatory agreement signed by a novice rider who had ridden a horse only once before). Also, Eburn's statements when she first arrived at CPO undercut to a certain extent the presumption that, as a beginner, she was not informed about potential riding injuries. When she arrived, Eburn "advised Defendant's employee that she did not ride horses at all and needed a horse suitable for a beginner." (Doc. # 41 at 2.) This indicates that Eburn had some awareness of the potential for problems to occur if she was matched with a horse not suitable for her skill level. As such, consideration of the above factors leads the Court to conclude that, even though Eburn was a novice, the exculpatory agreement clearly and unambiguously expressed the parties' intent to preclude CPO's liability for negligent acts.

The Court's conclusion is supported by several cases in which either the Colorado Supreme Court or the Colorado Court of Appeals enforced an exculpatory agreement, similar to the one at issue here, concluding that it clearly expressed the parties' intent. For example, in *Riehl*, the plaintiff sued an equine activity sponsor to recover for injuries she sustained after falling from a rented horse. She had signed an exculpatory agreement containing language that released the sponsor from "any liability in the event of any injury or damage of any nature (or perhaps even death) to [her] or anyone else caused by [her] electing to mount and then ride a horse owned or operated by [the sponsor]." *Riehl*, 960 P.2d at 135. The supreme court ruled that the agreement

was written in simple and clear terms, was not too long, and that the plaintiff was aware she was signing a release, even though she stated that she "really didn't read" it. *Id.* at 138 and n.5.

Similar reasoning was employed in *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004), where the plaintiff was thrown off a mule and injured. The plaintiff had signed an exculpatory agreement that included a "RELEASE FROM ANY LEGAL LIABILITY . . . for any injury or death caused by or resulting from [his] participation in the activities." *Id.* at 468. The Colorado Supreme Court determined that, although the agreement did not contain the word "negligence," it was nonetheless sufficient to preclude liability on the plaintiff's negligence claims. *Id.* at 468-69. The court reasoned that the release: was not too long; did not contain legal jargon; and included language releasing the defendant from "any legal liability." *Id.*

Likewise, in *Hamill*, a division of the Colorado Court of Appeals upheld a three-and-a-half page exculpatory agreement and precluded the plaintiff's negligence claims, which stemmed from injuries she sustained after falling off a horse at a summer camp. 262 P.3d at 951. The agreement contained broad language, covering "inherent and *other risks*" and noted that "[m]any, *but not all*, *of these risks are inherent.*" *Id.* (emphasis in original) (quotation marks deleted). The agreement also included language releasing the defendant from "*any legal liability*," "*any injury*," and "*any claim.*" *Id.* (emphasis in original) (quotation marks deleted). In upholding the agreement, the division stated that it was not "inordinately long" and described the legal jargon as

10

"minimal." *Id.* The three-judge division further reasoned that "[t]he breadth of the release persuades us that the parties intended to disclaim legal liability for negligence claims." *Id.*

As in those cases, the exculpatory agreement Eburn signed contains broad language, including a waiver of all risks of injury, "both known and unknown," and a release "from any and all claims, demands, losses, and liability arising out of or related to any INJURY, DISABILITY OR DEATH[,] . . . to the fullest extent permitted by law." (Doc. # 26-1). Moreover, this waiver and release explicitly mentions CPO's negligence and is, for that reason alone, even clearer than those agreements in the above-cited cases which did not specifically include the word "negligence."

Eburn's assorted arguments do not require a contrary conclusion. To begin with, although Eburn aptly notes that CPO did not fill in the blank in paragraph four of the exculpatory agreement (following the words "RELEASE, INDEMNIFY, AND HOLD HARMLESS THE"), she is simply incorrect in asserting that "Defendant's name appears nowhere" on the exculpatory agreement. (Doc. # 22 at 5.) As previously mentioned, CPO's name is handwritten – in large letters, no less – toward the top of the agreement. Such a designation clearly indicates the party to be released, indemnified, and held harmless, notwithstanding the later absence of CPO's name on the agreement. Additionally, contrary to Eburn's assertion, a reading of both pages of the exculpatory agreement indicates that the "activities involved in this program" included a horseback ride, which is unquestionably an "equine activity." (*See, e.g.*, Doc. # 26-1 ("Equine

11

activities are inherently dangerous" (emphasis deleted)).)  Also, Eburn herself states that she went to CPO in order to go horseback riding.  (Doc. # 1 at 3.)  A somewhat closer question is presented by Eburn's assertion that the exculpatory agreement did not cover CPO's medical response.  Again, however, the breadth of the agreement, as well as language releasing CPO from injuries arising from its own negligence, sufficiently included CPO's medical response which, necessarily, followed her fall from the horse.[6]

Further, the Court disagrees with Eburn's assertion that the exculpatory agreement did not contain "the required statutory warning language," which is mandated by Colo. Rev. Stat. § 13-21-119(5).[7]  The statutory language is: "Under Colorado Law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to section 13-21-119, Colorado Revised Statutes."  *Id.*  But the Colorado Supreme Court has construed the statute merely to provide "that every release agreement between an equine professional and a participant include the warning that the equine professional is not

---

[6] Because the exculpatory agreement precludes Eburn from asserting a negligence claim against CPO for its emergency medical response, the Court declines to address CPO's alternative argument that her claim is barred by Colorado's "Good Samaritan Act," Colo. Rev. Stat. § 13-21-108.

[7] Section 13-21-119, Colorado's "Equine Statute," provides an exemption from civil liability "for sponsors of equine activities and equine professionals with respect to inherent risks of equine activity.  Subsection (4)(b) of the Equine Statute establishes exceptional circumstances where common law civil liability still may be imposed."  *Clyncke v. Waneka*, 157 P.3d 1072, 1074 (Colo. 2007).  CPO raised the Equine Statute as an affirmative defense (Doc. # 4 at 4), but it is not implicated by the exculpatory agreement here, other than as to the mandatory warning discussed in the text above.

liable for 'inherent risks' resulting from an equine activity." *Riehl*, 960 P.2d at 137. The exculpatory agreement here did so, especially in the section entitled "NOTICE OF INHERENT RISKS[,]" which enumerates such risks pertaining to the behavior of equines. (*See* Doc. # 26-1.) To the extent Eburn's argument is that the language proposed in § 13-21-119 must be employed verbatim in an exculpatory agreement, she cites no authority supporting her position, nor is the Court aware of any. Moreover, a broadly written exculpatory agreement, such as the one in this case, "evinces an intent to extinguish liability above and beyond that provided in section 13-21-119." *Riehl*, 960 P.2d at 138. Accordingly, the Court cannot conceive of how Eburn could have been harmed by the absence of a verbatim statutory warning, when the exculpatory agreement she signed waived CPO's liability for more than just the "inherent risks of equine activities" that the statutory warning mentions.

Finally, and perhaps most problematically for Eburn, is her reliance on *Riehl v. B & B Livery, Inc.*, 944 P.2d 642 (Colo. App. 1997), in which a division of the Colorado Court of Appeals held that a broadly written exculpatory agreement was ambiguous because it also contained a warning covering the inherent risks of equine activities. That holding was reversed by the Colorado Supreme Court in the *Riehl* decision, 960 P.2d at 138-39, which has been cited several times above. For reasons too obvious to articulate here, the Court is not persuaded by an argument based on a case that is no longer good law.

## IV. **CONCLUSION**

For the foregoing reasons, it is ORDERED that Eburn's motion for partial summary judgment (Doc. # 22) is DENIED and CPO's cross motion for partial summary judgment (Doc. # 26) is GRANTED. As such, Eburn's first claim, for negligence, is DISMISSED, although her other claims for relief remain.

DATED: July __30__, 2012

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge